MARKETING DESIGN SOURCE, INC.

v.

PRANDA NORTH AMERICA, INC.

No. 2001–32–Appeal.

Supreme Court of Rhode Island.

June 12, 2002.

Geoffrey Alan Regan, Alfred Factor, for Plaintiff.

Dennis J. Tente, Cranston, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

**OPINION**

BOURCIER, Justice.

Although it remains true that people, when contracting, contemplate performance and not breach, it is equally true that in most contracts the parties "take the risk of events over which they have imperfect or no control."[1] In this breach of contract action, Pranda North America, Inc. (Pranda), appeals from the entry of a Superior Court final judgment in favor of Marketing Design Source, Inc. (MDS), for $123,845.78, and from the entry of judgment as a matter of law in favor of MDS on Pranda's counterclaims.

**I**

**Facts/Procedural History**

Pranda is a jewelry manufacturer. MDS was a corporation that provided marketing and advertising services to its corporate clients.[2] In 1992, a representative of Pranda approached the owner of MDS, Margaret Cook (Ms. Cook), to engage MDS to provide a series of marketing and advertising services to Pranda.

After some negotiation, Pranda and MDS entered into a contract dated April 30, 1992, but not formally executed until May 18, 1992. The contract included reference to a plan that the parties also had negotiated, and it provided that "[a] 50 % kill fee will be applied to all specific elements started and stopped by Pranda Group of North America on the plan outlined and dated 4.30.92." In addition, it provided that should Pranda "modify, reject or stop any and all plans, schedules or work in process[,]" Pranda would assume MDS's liabilities "for all expenses incurred or resulting from uncancellable commitments."

The first project that MDS undertook for Pranda was entitled the "Premier Project." MDS and Pranda agreed to an initial budget of $60,000. That figure later was adjusted to $75,000 with Pranda's consent. The purpose of the Premier Project was to launch a new jewelry product line on the market that included preparing for a trade show presentation and producing "sophisticated" brochure and direct mail offerings to prospective buyers. Before it was completed, Pranda stopped the project. Pursuant to the "kill fee" provision in the contract, MDS billed Pranda for 50 percent of the contract fee; namely, $37,930.[3] Pranda paid MDS only $22,000 leaving an outstanding balance of $15,930 on the invoiced "kill fee."

---

1. *Ferry v. Ramsey*, 277 U.S. 88, 95, 48 S.Ct. 443, 444, 72 L.Ed. 796, 799 (1928) (Holmes, J.).

2. MDS no longer is doing business.

3. The invoice indicated that the contract price was $75,860.

Meanwhile, MDS began working on a second project for Pranda. This project was known as the "Retail Flyer Program" (the Flyer Program). The Flyer Program involved the creation of brochures to reflect Pranda's jewelry products, and it was to be supported by television and radio advertising. Pranda required samples of the finished flyers to be available for a trade show scheduled to take place in New York on January 27, 1993.

After initial discussions about the retail flyer program were held in late July to early August, a baseline budget for that program was estimated to be $92,825. However, as the program gradually became more detailed, there was a concomitant increase in its projected budget. With each projected increase in the budget, MDS sought and received prior approval from Pranda to continue with the program. Meanwhile, concerned with the budget increases, Pranda decided on October 19, 1992, to put the Flyer Program on hold. It later gave MDS permission to resume the program on November 18, 1992.

On January 21, 1993, Ms. Cook met with officials from Pranda to review samples of the final prints of the flyers and to discuss the final budget. Both Ms. Cook and the officials from Pranda expressed concern over the quality of the flyers. The president of Pranda, Kit Catanzaro, suggested that MDS print only 500 flyers for the January 27, 1993 New York trade show deadline rather than the 3,000 required by the contract. Ms. Cook suggested that if Pranda was dissatisfied, then perhaps it might want to cancel the project; otherwise, MDS would go forward. Mr. Catanzaro then gave MDS permission to proceed with the project and approved the final budget.

On January 27, 1993, Ms. Cook delivered 300 flyers to Pranda. Pranda's vice president, Paul Oristaglio, expressed dissatisfaction with the flyers and refused to pay MDS. He then refused to give the flyers back to Ms. Cook, saying that he wanted to show them to the company's salespeople at the trade show in New York to determine whether they could be used. Apparently, the flyers were shown to the salespeople at the New York trade show and were not used by Pranda thereafter. Sometime later, Pranda contracted with another company to produce alternative flyers.

Meanwhile, MDS filed a civil action for breach of contract in the Superior Court. Count 1 in its complaint sought payment from Pranda for the outstanding balance remaining on the Flyer Program. Count 2 sought payment of the balance due on the 50 percent "kill fee" for the Premier Project. Pranda answered the complaint by denying liability to MDS, and filed its own two-count counterclaim demanding a trial by jury. In count 1 of its counterclaim, Pranda asserted that the work performed by MDS on the Flyer Program was both defective and untimely. Count 2 contended that the flyer that MDS had produced for the program, "was not merchantable, not fit for the purpose intended and otherwise in breach of the warranties of the plaintiff."

The case later was reached for trial before a Superior Court trial justice and jury. After the parties had completed the presentation of their respective cases, MDS moved for entry of judgment as a matter of law on Pranda's counterclaims. It contended that Pranda had failed to show that the flyers were not usable. The trial justice agreed and granted the motion. In reaching his decision, the trial justice observed that Mr. Oristaglio, Pranda's vice president, had agreed to leave the ultimate decision about whether the flyers were usable to the opinions of Pranda's

salespeople at the New York trade show. He then determined that the complete absence of testimony from those salespeople was "critical" to Pranda's counterclaims and, absent that evidence, its counterclaims were unsupported.

Meanwhile, Pranda renewed a previous motion for judgment as a matter of law on count 2 of MDS's complaint. It contended that because the 50 percent "kill fee" was based upon a plan that MDS did not present at trial, MDS had failed to prove any damages that it may have incurred. The trial justice denied Pranda's motion, finding that damages was a credibility matter for the jury because conflicting testimony on that issue had been introduced at trial. He then submitted the case to the trial jury. It later returned a verdict in favor of MDS, finding that the Flyer Program contract had been modified by the parties and that Pranda had breached the modified contract. It additionally found that the Premier Project contract also had been breached by Pranda. The jury awarded MDS $60,942.80 in damages.[4] Pranda timely appealed.

## II

## Analysis

Pranda contends that the trial justice erred in granting MDS's motion for judgment as a matter of law on both counts of its counterclaim and in failing to grant its own motion for judgment as a matter of law on count 2 of MDS's complaint. It maintains that it was prejudiced as a result of being precluded from presenting its recoupment claim to the jury for its consideration; asserts that the trial justice erred in finding that it had the burden to prove

that the flyers were not usable; and, asserts that the burden to prove the usability of the flyers rested upon MDS. It additionally maintains that its own motion for judgment as a matter of law should have been granted with respect to count 2 of MDS's complaint because it contends that MDS's failure to present the plan upon which the Premier Project was based was fatal to its claim for damages. Finally, Pranda maintains that MDS failed to prove its damages by a reasonable degree of certainty and that the jury improperly based its damages award upon speculation.

### A. Judgment as a Matter of Law

"The standard for granting a motion for judgment as a matter of law is the same as that applicable to its precursor, a motion for a directed verdict." *Martinelli v. Hopkins*, 787 A.2d 1158, 1165 (R.I.2001) (quoting *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1062 (R.I.2001)). In doing so, the trial justice examines:

"the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Id.* (quoting *Raimbeault*, 772 A.2d at 1062–63).

However, when "no relevant issues of fact exist and defendant is entitled

<hr/>

4. The jury awarded $45,012.80 to MDS on the Flyer Program by subtracting $84,026.20, an amount previously paid to MDS by Pranda, from the total amount of $129,039. On the Premier Project, the jury awarded to MDS the

$15,930 balance remaining on the 50 percent "kill fee." Interest thereon later was added to the verdict by the court clerk pursuant to G.L.1956 § 9–21–10, bringing the total judgment to $123,845.78.

to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint." *Id.* (quoting *Swerdlick v. Koch,* 721 A.2d 849, 856 (R.I. 1998)). In our review of the trial justice's decision, we are "bound by the same rules and [standards] as the trial justice." *Id.* (quoting *Raimbeault,* 772 A.2d at 1063).

### (i) The Flyer Program

Pranda contends that the trial justice applied an incorrect burden of proof when he dismissed both counts of its counterclaim as a matter of law. It maintains that MDS had the burden to prove the usability of the flyers, and that the trial justice erred in finding that it was Pranda's burden to prove that the flyers were unusable. Consequently, it asserts that it was not required to offer usability testimony from its salespeople. We disagree.

Pranda asserted in its counterclaims that the work performed by MDS on the Flyer Program was both defective and untimely and that that the flyer, "was not merchantable, not fit for the purpose intended and otherwise in breach of the warranties of the plaintiff." Thus, Pranda's counterclaims were in the nature of: (1) breach of the implied warranty of merchantability, and (2) breach of the implied warranty of fitness for a particular purpose.

▮ "In order to establish liability for breach of the implied warranty of merchantability, [a] plaintiff must 'prove that the product is defective, that it was in a defective condition at the time it left the hands of the seller, and that said defect [was] the proximate cause of the injury.' " *Lariviere v. Dayton Safety Ladder Co.,* 525 A.2d 892, 896 (R.I.1987) (quoting *Plouffe v. The Goodyear Tire & Rubber Co.,* 118 R.I. 288, 294, 373 A.2d 492, 495 (1977)). "A product is merchantable when it is 'fit for the ordinary purposes for which such goods are used.' " *Lariviere,* 525 A.2d at 896 (quoting G.L.1956 § 6A–2–314(2)(c)).

▮ In this case, it was defendant Pranda that asserted in count 2 of its counterclaim that MDS had breached its implied warranty of merchantability; consequently, Pranda had the burden of proving that the flyers were not fit for the ordinary purposes for which such flyers were intended to be used. The record reveals that Pranda retained the flyers to consult with its salespeople at the New York trade show concerning the usability of the flyers. Although the flyers apparently were not used after the show, nothing in the record indicates that Pranda's salespeople ever had determined that the flyers were not usable. Considering that Pranda's evidence failed to demonstrate that the flyers were not fit for the ordinary purposes for which the flyers were intended to be used, the trial justice did not err in granting MDS's motion for judgment as a matter of law on Pranda's claim for breach of an implied warranty of merchantability.

▮ "An implied warranty of fitness for a particular purpose arises when the seller has reason to know the buyer's particular purpose and that the buyer is relying on the seller's skill or judgment to furnish appropriate goods and the buyer relies on the seller's skill or judgment." *Lariviere,* 525 A.2d at 897 (citing *Keenan v. Cherry & Webb,* 47 R.I. 125, 128, 131 A. 309, 311 (1925)). "[A] dealer who sells articles which ordinarily are used in but one way impliedly warrants fitness for use in that particular way unless there is evidence to the contrary." *Id.* (quoting *Keenan,* 47 R.I. at 129, 131 A. at 311). In this case, Pranda presented no evidence that it intended to use the flyers for a particular use other than their ordinary use; namely, for marketing and advertising purposes,

and there is nothing in the contract requiring that the flyers be a perfect product. Consequently, the trial justice did not err in granting MDS's motion for judgment as a matter of law on Pranda's claim of breach of an implied warranty of fitness for a particular purpose.

■ Pranda additionally contends that it was prejudiced before the jury following the dismissal of its counterclaims because such dismissal prevented the jury from considering its claims for recoupment. We conclude, however, that the prejudice, if any, was harmless. The record reveals that the trial justice clearly instructed the jury concerning MDS's breach of contract claim, as well on the issues of implied warranties of merchantability and fitness for a particular purpose. Armed with these instructions, the jury found that MDS had not breached the contract. *See State v. Perry,* 770 A.2d 882, 885 (R.I.2001) (reiterating that "jury members are presumed to follow the instructions given by a trial justice"). Considering that the jury found MDS had not breached the contract, it is unlikely that it would have given any serious consideration to Pranda's claim for recoupment.

### (ii) The Premier Project

■ Count 2 of MDS's complaint sought damages from Pranda for breach of the Premier Project contract. To prevail on this claim, Pranda maintains that MDS was required to present the specific written plan upon which the Premier Project was based, and that its failure to do so should have resulted in the grant of its motion for judgment as a matter of law with respect to count 2 of MDS's complaint.

General Laws 1956 § 6A–2–201(1) provides in pertinent part:

"Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker."

The record reveals that Pranda never has disputed the fact that a written plan for the Premier Project actually existed, and it never disputed as inaccurate the amount reflected on the invoice that MDS billed to Pranda on the Premier Project. Although MDS did not produce the written plan at trial, because of these tacit admissions, such failure was not fatal to MDS's claim. Consequently, the trial justice did not err in failing to grant Pranda's motion for judgment as a matter of law on count 2 of MDS's complaint.

### B. Damages

■ Pranda finally contends that MDS did not prove damages by a reasonable degree of certainty and that, consequently, the jury's award improperly was based upon speculation.

■ "The amount of damages sustained from a breach of contract must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures and cannot rely upon speculation." *Sea Fare's American Cafe, Inc. v. Brick Market Place Associates,* 787 A.2d 472, 478 (R.I.2001) (per curiam) (quoting *National Chain Co. v. Campbell,* 487 A.2d 132, 134–35 (R.I.1985)). As long as the complaining party can "prove damages with reasonable certainty[,]" such damages will not be denied merely because they "are difficult to ascertain[.]" *Id.* at 478 (quoting *National Chain Co.,* 487 A.2d at 135). Once MDS proved that Pranda breached the contract,

it was entitled to be "made whole;" namely, it was entitled to be awarded the amount it would have received from Pranda, had Pranda fully performed the contract. *See Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1193 (R.I.1994). That amount was readily ascertainable from the trial evidence.

The record reveals that the damages testimony given by Ms. Cook was uncontested. She testified that at every stage of the services performed, she discussed the budget with officials from Pranda and was given permission by them to continue. She produced an invoice for the Premier Project that amounted to $75,860, and testified that the 50 percent "kill fee" for such cancellation amounted to $37,930. Because Pranda already had paid $22,000 to MDS, she posited that Pranda owed a balance of $15,930 to MDS on the Premier Project. Not too coincidentally, the jury awarded $15,930 in damages to MDS on the Premier Project.

 As for the damages award on the Flyer Program, Ms. Cook testified that the total amount owed on the contract was $129,039 and that because Pranda already had paid $84,026.20 toward that amount, MDS was entitled to the difference of $45,012.20. Although Pranda asserts that the failure by MDS to itemize the invoice was fatal to its claim for damages on the Flyer Program, our case law has not decreed that itemization is a necessary requirement. The record reveals that the jury awarded $45,012.20 to MDS on the Flyer Program, the same amount it claimed at trial. Our review of the case file reveals that the jury did not rely upon speculation when it made its damages determination.

For the foregoing reasons, Pranda's appeal is denied and dismissed. The judg-ment is affirmed and the papers are to be returned to the Superior Court.